IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

VANESSA LYNNE MONTOYA,

    Plaintiff,

v.                                                                                                            1:16-cv-00021-LF

NANCY A. BERRYHILL,[1]
Acting Commissioner of the
Social Security Administration,

    Defendant.

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on plaintiff Vanessa Lynne Montoya's Motion to Reverse and Remand (Doc. 18), which was fully briefed September 7, 2016. Docs. 22, 23, 24. The parties consented to my entering final judgment in this case. Docs. 4, 11, 12. Having meticulously reviewed the entire record and being fully advised in the premises, I find that the Administrative Law Judge ("ALJ") failed either to incorporate, or to explain why he rejected, limitations assessed by the two consulting psychologists who examined Ms. Montoya. The ALJ also failed to adequately develop the record to determine whether Ms. Montoya suffers from an intellectual disability that meets or equals the requirements of a Listing. I therefore GRANT Ms. Montoya's motion and remand this case to the Commissioner for proceedings consistent with this opinion.

---

[1] Nancy A. Berryhill, the new Acting Commissioner of Social Security, is automatically substituted for her predecessor, Acting Commissioner Carolyn W. Colvin, as the defendant in this suit. FED. R. CIV. P. 25(d).

## I. Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision[2] is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008). If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks and brackets omitted). The Court must meticulously review the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the Court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

---

[2] The Court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. §§ 404.981, 416.1481, as it is in this case.

**II. Applicable Law and Sequential Evaluation Process**

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show: (1) the claimant is not engaged in "substantial gainful activity;" (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv), 416.920(a)(4)(i–iv); *Grogan*, 399 F.3d at 1260–61. If the claimant cannot show that his or her impairment meets or equals a Listing but proves that he or she is unable to perform his or her "past relevant work," the burden of proof shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering the claimant's residual functional capacity ("RFC"), age, education, and work experience. *Id.*

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

3

### III. Background and Procedural History

Ms. Montoya was born in 1986 and completed some middle school. AR 42–44, 71.[4] She testified that she attempted to attend a high school for six or seven months, but she dropped out "because [she] didn't understand it." AR 43. She testified she was in special education the entire time she was in school. AR 44–45. She was in special education because she could not "do math," nor could she "read or write." AR 45. She believed that she may have attained a second or third grade reading level, and thought that her school should have records of that. *Id.*

Ms. Montoya had worked in the past for several fast food restaurants, but she was fired for various reasons. *See* AR 46, 51–52, 247–48, 283. She was self-employed as a house cleaner from about 2010 to 2012. *See* AR 60, 248–49, 283. Beginning in 2013, she worked part-time as a care giver for her mother and step-father. *See* AR 32–34, 245–46.

Ms. Montoya filed applications for disability insurance benefits and supplemental security income on January 10, 2013, alleging disability since December 1, 2011, due to a torn ligament and water in both knees, mental problems, a learning disability, and stroke. AR 223–29, 258. The Social Security Administration ("SSA") denied her claims initially on July 26, 2013. AR 155–61. The SSA denied her claims on reconsideration on September 24, 2013. AR 164–73. Ms. Montoya requested a hearing before an ALJ. AR 174–76. On April 15, 2015, ALJ Eric Weiss held a hearing. AR 27–68. ALJ Weiss issued his unfavorable decision on June 5, 2015. AR 8–26.

At step one, the ALJ found that Ms. Montoya had not engaged in substantial, gainful activity since December 1, 2011. AR 13. Because Ms. Montoya had not engaged in substantial gainful activity for at least twelve months, the ALJ proceeded to step two. *Id.* At step two, the

---

[4] Documents 15-1 through 15-13 comprise the sealed Administrative Record ("AR"). When citing to the record, the Court cites to the AR's internal pagination in the lower right-hand corner of each page, rather than the CM/ECF document number and page.

ALJ found that Ms. Montoya suffered from the following severe impairments: left knee anterior cruciate ligament tear, medial meniscus tear, lateral meniscus tear status post ACL reconstruction hamstring autograft, medial meniscus repair, and partial lateral menisectomy; learning disability in reading and mathematics; depressive disorder; and paranoid personality traits. AR 13–14. At step three, the ALJ found that none of Ms. Montoya's impairments, alone or in combination, met or medically equaled a Listing. AR 14–16. The ALJ specifically considered and rejected the possibility that Ms. Montoya's mental impairments, singly or in combination, met or medically equaled the criteria of Listings 12.04 and 12.06, relating to depressive disorders and anxiety and obsessive-compulsive disorders, respectively. *Id.* The ALJ did not consider whether Ms. Montoya's mental impairments met or medically equaled the criteria of Listing 12.05, relating to intellectual disorders, despite Ms. Montoya's request that he do so. *See* AR 14–16, 30, 66, 329–30.

Because the ALJ found that none of the impairments met a Listing, the ALJ assessed Ms. Montoya's RFC. AR 16–19. The ALJ found that:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to lift 20 pounds occasionally and lift or carry 10 pounds frequently, and push or pull the same. She may walk or stand for 6 hours per 8 hour day and sit for 6 hours per 8 hour day with normal breaks. She may occasionally climb ramps and stairs but never ladders, ropes and scaffolds. She may occasionally balance, stoop, crouch, kneel and crawl. She must avoid more than frequent exposure to moving machinery and unprotected heights. She is able to understand, carry out, and remember simple instructions and make commensurate work related decisions. She is able to maintain concentration, persistence and pace for 2 hours at a time with normal breaks throughout the workday. She is limited to occasional interaction with co-workers and supervisors but no interaction with the public. In addition, I have determined the claimant has the ability to perform no more than the full range of light work with above-stated limitations or extensions. Unless otherwise noted, the claimant can lift, carry, push or pull no more than 20 pounds at a time and frequently lift, carry, push or pull objects weighing up to 10 pounds. "Frequent" means occurring from one-third to two-thirds of an eight-hour workday. The claimant can walk off-and-on for no more than about six hours

5

>during an eight-hour workday, stand off-and-on for no more than about six hours during an eight-hour workday, and can stand or walk off-and-on for a total of about six hours during an eight-hour workday. The claimant can sit for approximately six hours total during an eight-hour workday. The claimant may stoop occasionally, which means stooping for very little up to one third of an eight-hour workday.

AR 16.

At step four, the ALJ concluded that Ms. Montoya was unable to perform her past relevant work as a house cleaner and "home attendant." AR 20, 59–61. The ALJ found Ms. Montoya not disabled at step five, concluding that she still could perform jobs that exist in significant numbers in the national economy, such as a "cleaner," a "marker," and a "hand presser." AR 20–21.

Ms. Montoya requested review by the Appeals Council, which, on December 3, 2015, denied the request. AR 1–6, 344–50. Ms. Montoya timely appealed to this Court on January 12, 2016. Doc. 1.

**IV.     Ms. Montoya's Claims**

Ms. Montoya raises three arguments for reversing and remanding this case: (1) substantial evidence does not support the RFC because the ALJ failed to offer legally sufficient reasons for rejecting some of the findings and opinions of two consulting psychologists and the consulting doctor; (2) the ALJ failed to adequately develop the record regarding Ms. Montoya's cognitive functioning; and (3) the ALJ improperly relied on the vocation expert's ("VE") testimony because the hypothetical posed to the VE did not include all Ms. Montoya's limitations. I remand because the ALJ failed to offer legally sufficient reasons for rejecting some of the findings and opinions of two consulting psychologists and failed to adequately develop the record regarding Ms. Montoya's cognitive functioning. I do not address the other alleged errors

6

as they "may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

V.   **The ALJ Erred by Failing Either to Incorporate, or to Explain Why He Rejected, Limitations Noted in the Reports of Examining Consulting Psychologists Dr. Finian Murphy and Dr. Amy DeBernardi.**

Ms. Montoya argues that the ALJ committed legal error by failing to incorporate, without explanation, limitations assessed by consulting psychologists Dr. Finian Murphy and Dr. Amy DeBernardi into Ms. Montoya's RFC. Doc. 18 at 16–19. The Commissioner argues that the ALJ reasonably assessed and adopted the limitations expressed in both doctors' opinions. Doc. 22 at 9–12. For the reasons discussed below, I find that the ALJ committed legal error in assessing the opinion of Dr. Murphy. Dr. DeBernardi's opinion, however, was unclear, and on remand the ALJ will have the opportunity to clarify whether Ms. Montoya's RFC adequately encompasses the limitations assessed by Dr. DeBernardi, or explain why he is rejecting some of them.

"If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." SSR 96-8p, 1996 WL 374184, at *7. "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on [a specific] functional capacity" because "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012) (alteration and internal quotation marks omitted)); *see also Wells v. Colvin*, 727 F.3d 1061, 1071 (10th Cir. 2013) ("exact correspondence between a medical opinion and the mental RFC is not required"). Nevertheless, "[a]n ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability." *Chapo*, 682 F.3d at 1292 (quoting *Haga v. Astrue*, 482 F.3d 1205,

7

1208 (10th Cir. 2007)). An ALJ "must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Ultimately, an ALJ is required to weigh medical source opinions and to provide "appropriate explanations for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183, at *5; *see also Keyes-Zachary*, 695 F.3d at 1161 (same) (citing 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii)).

In *Haga*, the Tenth Circuit held that an ALJ erred in failing to explain why he adopted some of a consultative examiner's ("CE") restrictions but rejected others. 482 F.3d at 1208. "[T]he ALJ did not state that any evidence conflicted with [the CE's] opinion or mental RFC assessment. So it is simply unexplained why the ALJ adopted some of [the CE's] restrictions but not others." *Id.* The court remanded the case "so that the ALJ [could] explain the evidentiary support for his RFC determination." *Id.*

Here, the ALJ assigned "great weight" to the medical source opinion of Dr. Finian Murphy, a consultative examining psychologist. AR 18. Dr. Murphy examined Ms. Montoya on May 17, 2011, and found that Ms. Montoya had the following limitations:

- Moderate to marked limitation in the ability to understand verbal and written instructions;
- Moderate to marked limitation in the ability to carry out instructions;
- Moderate to marked limitation in concentration and persistence.

AR 486.

The ALJ also assigned "great weight" to the medical source opinion of Dr. Amy DeBernardi, another consultative examining psychologist. AR 18. Dr. DeBernardi examined Ms. Montoya on April 18, 2013, approximately two years after Dr. Murphy's examination. AR 423. Dr. DeBernardi found that Ms. Montoya had "long standing issues related to depression and paranoia," which "appear[ed] to be impacting her functioning to a significant degree." AR

426. Her functional assessment of Ms. Montoya's limitations was that Ms. Montoya's "[i]mmediate memory is fair," her "[s]ustained concentration and persistence are also fair," and her "[a]daptive skills and ability to tolerate stress are limited." *Id.*

> The ALJ assessed Dr. Murphy and Dr. DeBernardi's opinions together, as follows:
>
> Amy DeBernardi, Psy.D., and Finian Murphy, Ed.D., consultative examiners, completed assessments of the claimant's mental impairments. The assessments completed medical source statements indicating moderate limitations in both social functioning and concentration, persistence, and pace. . . . The opinions of the doctors are given great weight because they are consistent with the treatment notes, consultative exams, GAF scores, subjective complaints, mental status exams, and her activities of daily living, as discussed above.

AR 18.

To accommodate Ms. Montoya's mental limitations, the ALJ found that Ms. Montoya had the RFC to:

> to understand, carry out, and remember simple instructions and make commensurate work related decisions. She is able to maintain concentration, persistence and pace for 2 hours at a time with normal breaks throughout the workday. She is limited to occasional interaction with co-workers and supervisors but no interaction with the public.

AR 16. In essence, the ALJ rejected Dr. Murphy's determination that Ms. Montoya was moderately to markedly limited in her ability to carry out *any* instructions; Dr. Murphy did not limit his assessment to "detailed" instructions. The ALJ also decided, without explanation, that Ms. Montoya was only moderately limited, not markedly limited, in her ability to understand and carry out instructions. Similarly, the ALJ decided, without explanation, that Ms. Montoya was only moderately limited in persistence and pace, not markedly so. The ALJ did not explain why he only partially adopted Dr. Murphy's assessment.

Whether the ALJ actually adopted the limitations assessed by Dr. DeBernardi is less clear, as Dr. DeBernardi did not express her opinion in the same terms used by the ALJ and the SSA. For example, Dr. DeBernardi opined that Ms. Montoya's long standing depression and

9

paranoia impacted her functioning to a "significant degree," but it is not clear whether "significant" means moderate or marked. *See* AR 426. Dr. DeBernardi also states that Ms. Montoya's "[a]daptive skills and ability to tolerate stress are limited," but she does not say whether they are moderately or markedly limited (or even mildly limited). On remand, the ALJ will have an opportunity to clarify Dr. DeBernardi's opinions regarding the extent of Ms. Montoya's mental limitations, and explain why he adopts those limitations in whole or in part.

The Commissioner contends that the ALJ's RFC "was generally consistent with the limitations assigned by Dr. Murphy," and cites to three cases in which the Tenth Circuit held that an RFC that limits a claimant to unskilled work sometimes is sufficient to accommodate a claimant's mental limitations. Doc. 22 at 10. Here, however, the three jobs that the ALJ found Ms. Montoya capable of performing each had a specific vocational preparation ("SVP") of 2. Dictionary of Occupational Titles ("DOT") # 209.587-034 (Marker), # 323.687-014 (Cleaner), # 363.684.018 (Presser). The SVP is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, App'x C (4th ed., Rev. 1991). An SVP of 2 indicates that a typical worker will need up to a month to learn how to do a particular job. *Id.* Further, the ability to understand, remember, and carry out simple instructions is necessary for even unskilled work. SSR 96-9p, 1996 WL 274185, at *9. Thus, the ALJ's limitation to jobs that only had SVPs of 2 did not necessarily accommodate Dr. Murphy's assessment that Ms. Montoya was at least moderately, and perhaps markedly, limited in her ability to carry out *any* instructions.

The ALJ failed to sufficiently account for all the limitations found by Dr. Murphy. Under *Haga*, the ALJ must either adopt these limitations, or explain why he rejected them. Remand is therefore appropriate.

**VI.     The ALJ Failed to Adequately Develop the Record.**

Ms. Montoya also argues that the ALJ failed to adequately develop the record by failing to order Wechsler Adult Intelligence Scale (WAIS) testing to further explore Ms. Montoya's cognitive functioning, and by failing to further "assess [Ms. Montoya's] possible paranoid disorder." Doc. 18 at 22. The Commissioner responds that "the record was replete with evidence concerning [Ms. Montoya's] mental health, which consistently showed [her] symptoms were not debilitating, and this evidence was sufficient to allow the ALJ to reach a conclusion regarding [Ms. Montoya's] functional limitations." Doc. 22 at 17. Because the evidence in the record established a reasonable possibility that WAIS testing and a further consultative exam would materially assist in resolving the issue of disability, the ALJ had a duty to develop the record further.

Although generally the burden to prove disability is on the claimant, the ALJ bears responsibility for ensuring that "an adequate record is developed during the disability hearing consistent with the issues raised." *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) (internal citation and quotation omitted). An ALJ should order a consultative exam where there is a direct conflict in the medical evidence requiring resolution, where the medical evidence in the record is inconclusive, or where additional tests are required to explain a diagnosis already contained in the record. *Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997); *see also* 20 C.F.R. § 416.919a (describing the situations that may require a consultative examination). To warrant further investigation, there must be "some objective evidence in the record suggesting

the existence of a condition which could have a material impact on the disability decision." *Hawkins*, 113 F.3d at 1167. If the claimant is represented by counsel, the ALJ ordinarily may rely on counsel to identify any issues that require further development. *Id.* But if "evidence in the record establishes the reasonable possibility of the existence of a disability and the result of [a] consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability," the ALJ should order the exam. *Id.* at 1169.

To meet the requirements of Listing 12.05,[5] the claimant must satisfy that Listing's "capsule definition" in addition to one of the four "severity prongs" for an intellectual disability as listed in the regulations. *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009). The capsule definition for Listing 12.05 states: "Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, 12.05 (effective May 18, 2015 to June 12, 2015). The severity prong found in 12.05C[6]—the provision at issue here—requires a showing of a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

---

[5] The SSA has revised Listing 12.05, and the current version became effective March 27, 2017. Because the SSA expects federal courts to review its "final decisions using the rules that were in effect at the time [SSA] issued the decisions," Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138 n.1 (Sept. 26, 2016), the Court has used the version of the Listing that was in effect when the ALJ issued his decision. However, "[i]f a court reverses [the SSA's] final decision and remands a case for further administrative proceedings after the effective date of these final rules, [the SSA] will apply these final rules to the entire period at issue in the decision [the SSA] make[s] after the court's remand." *Id.*

[6] The relevant Listing in effect now is 12.05B, which has similar IQ requirements, requires that there be "significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two" of the listed areas of mental functioning, and evidence that supports the conclusion that the disorder began prior to age 22. 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, 12.05B (effective March 27, 2017).

*Id.*, 12.05C. "Standardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, 12.00B(6) (effective May 18, 2015 to June 12, 2015).

In this case, the evidence before the ALJ established the reasonable possibility of the existence of an intellectual disability, and the result of a consultative exam that included a standardized intelligence test was essential to the determination of whether Ms. Montoya met the requirements of Listing 12.05C. Both Dr. Murphy and Dr. DeBernardi diagnosed Ms. Montoya with unspecified learning disabilities in reading and math. AR 426, 486. Although Dr. Murphy opined that Ms. Montoya was of "low average intelligence," AR 489, his report did not disclose how he made this determination. *See* AR 486–89. He did not identify any psychological test used to determine her intelligence. *See id.*

In addition, Ms. Montoya testified that she had been in special education classes her "whole life," that she never finished the seventh or eighth grades, that she had tried to go to high school but she couldn't because she "didn't understand it," and that she believed that her school records would establish that she could read at the second or third-grade reading level. AR 42–45. Although four Disability Determination Explanations refer to a record of Ms. Montoya's "grades" from the charter high school that she briefly attended—notably, they do not state what the grades were—none of her school records are in the administrative record. *See* AR 76, 96, 116–17, 137–38; Doc. 15-2 (listing all documents in the administrative record). And although learning disabilities are not necessarily indicative of an intellectual disability, the current SSA regulations recognize that a history of special education services and low academic performance and functioning at school, along with low intelligence test scores, can support the finding of an intellectual disability, and also that the disorder began before age 22. *See* 20 C.F.R. Ch. III, Pt.

404, Subpt. P, App. 1, 12.00H(4) (effective March 27, 2017). Several courts also have recognized this connection. *See, e.g.*, *Havenar v. Astrue*, 438 F. App'x 696, 697–99 (10th Cir. 2011) (unpublished) (ALJ was required to determine whether claimant who had "advanced through seventh grade in a special education curriculum," "dropped out of school due to difficulty reading and writing," and had "full scale IQ of 70" met the requirements of Listing 12.05C); *Harrold v. Astrue*, 299 F. App'x 783, 784–89 (10th Cir. 2008) (unpublished) (remanding case to determine whether claimant who had graduated from high school attending special education classes, had IQ test result showing full scale IQ of 61, and described himself as having a learning disability, met the requirements of Listing 12.05C); *Bull v. Colvin*, No. Civ-14-541, 2016 WL 1076927, at *2–5 (E.D. Okla. Mar. 3, 2016) (unpublished) (claimant with learning disability, history of being educated in special education classes, and full scale IQ of 70, in addition to being unable to perform his past relevant work, presented sufficient evidence to meet the requirements of Listing 12.05C).[7]

The evidence before the ALJ was sufficient to warrant further development of the record. Ms. Montoya's educational history and poor work history, along with the uncontroverted evidence of her learning disabilities in reading and math, "demonstrate[] or support[] onset of the impairment before age 22." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, 12.05 (effective May 18, 2015 to June 12, 2015). Indeed, Ms. Montoya was only 24 when Dr. Murphy examined her, AR 487, and there is no evidence in the record to suggest that Ms. Montoya's intellectual limitations were a recent development. In addition, the ALJ found that Ms. Montoya had several "physical or other mental impairment[s] [that] impos[ed] an additional and significant work-

---

[7] Although Ms. Montoya does not claim that the ALJ failed to adequately develop the record by not obtaining her educational records, the cases that discuss Listing 12.05 certainly suggest that educational records would be helpful and material to the ALJ's determination of whether Ms. Montoya's mental impairments meet or equal Listing 12.05.

14

related limitation of function." *Id.*, 12.05C. Specifically, the ALJ found that Ms. Montoya suffered from the severe impairments of a left knee anterior cruciate ligament tear, medial meniscus tear, lateral meniscus tear status post ACL reconstruction hamstring autograft, medial meniscus repair, and partial lateral menisectomy; learning disability in reading and math, depressive disorder, and paranoid personality traits, which together prevented her from performing her past relevant work. AR 13, 20; *see Hinkle v. Apfel*, 132 F.3d 1349, 1352 & n.4 (10th Cir. 1997) (adopting the view "that the § 12.05C limitation is significant if the claimant suffers from a severe physical or other mental impairment, as defined at step two of the disability analysis, apart from the decreased intellectual function" and noting "[n]eedless to say, a claimant's inability to perform his past relevant work would meet the second prong of § 12.05C"); *Peck v. Barnhart*, 214 F. App'x 730, 734 (10th Cir. 2006) (unpublished) (ALJ's finding that claimant's other severe impairments of "anxiety related disorders and status post cervical fusion with chronic neck pain" prevented claimant from performing her past relevant work met "the additional significant impairment requirement under Listing 12.05(C)"). The only missing information for a determination of whether Ms. Montoya met the requirements of Listing 12.05C was a "valid verbal, performance, or full scale IQ of 60 through 70," 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, 12.05C (effective May 18, 2015 to June 12, 2015). The ALJ should have ordered a consultative exam that included IQ testing.

Further, Ms. Montoya's counsel specifically requested that Ms. Montoya be given a WAIS test before her hearing to aid in the determination whether she met the requirements of Listing 12.05. AR 329–30. Her counsel reiterated this concern at the administrative hearing. AR 66. The ALJ said that he would consider ordering the test if he thought it necessary "to reach a full and fair decision," AR 67, but ultimately he "did not find that WAIS testing was

15

necessary," AR 19. In short, this was not a situation where neither the claimant nor her counsel ever raised the issue. *Wall v. Astrue*, 561 F.3d 1048, 1062–65 (10th Cir. 2009) (rejecting argument that ALJ failed to develop the record with regard to claimant's alleged intellectual disability in part because "[n]either Claimant nor her counsel ever argued that a cognitive impairment contributed to Claimant's ability to work"); *Bland v. Astrue*, 432 F. App'x 719, 723 (10th Cir. 2011) (unpublished) ("the evidence before the ALJ was far from sufficiently compelling to require the ALJ to address explicitly Listing 12.05C in the absence of a request by [claimant's] counsel"). Given the evidence in the record that Ms. Montoya's cognitive impairments contributed to her inability to work, and given that her counsel specifically requested further testing to determine whether Ms. Montoya met the requirements of Listing 12.05C, the ALJ erred in failing to develop the record adequately with regard to Ms. Montoya's alleged intellectual disability.[8]

The Commissioner argues only that "the record was replete with evidence concerning Plaintiff's mental health, which consistently showed Plaintiff's symptoms were not debilitating, and this evidence was sufficient to allow the ALJ to reach a conclusion regarding Plaintiff's functional limitations." Doc. 22 at 17. The Commissioner's statement that the record was "replete" with evidence concerning Ms. Montoya's mental health is an overstatement. The 495-

---

[8] As noted in footnotes 5 and 6, *supra*, the ALJ on remand will apply the current Listing, which requires a particular IQ score as well as an "extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: (a) Understand, remember, or apply information (see 12.00E1); or (b) Interact with others (see 12.00E2); or (c) Concentrate, persist, or maintain pace (see 12.00E3); or (d) Adapt or manage oneself (see 12.00E4)." 20 C.F.R. Ch. III, Pt. 404, Subpt. P, App. 1, 12.05B (effective March 27, 2017). Thus, if the ALJ again only finds moderate limitations in these areas, he must explain why he is rejecting Dr. Murphy's assessment that she is moderately to markedly limited in her ability to concentrate and persist, and to understand written and verbal instructions. Given that more than six years has passed since Dr. Murphy's examination, and it's been more than four years since Dr. DeBernardi's exam, a consultative exam that specifically addresses all the current requirements of Listing 12.05B may be appropriate.

page administrative record contains two psychological reports, totaling 8 pages, which describe Ms. Montoya's mental functioning. AR 423–26, 486–89. One report was completed in May 2011, and the second in April 2013. *Id.* These reports were completed after a one-time consultative mental health exam, and only the second examiner, Dr. DeBernardi, reviewed any records. *See id.* Dr. DeBernardi apparently reviewed the executive summary of Dr. Murphy's report. *See* AR 423. Neither examiner reviewed any other medical or educational records. *See* AR 423, 487. The only other evidence in the record regarding Ms. Montoya's mental health (aside from her own testimony and reports, and those of her mother) were the mental residual functional capacity assessments performed by non-examining psychologists Ralph Rabinowitz and Carol Mohney. *See* AR 86–88, 106–08, 127–29, 148–50. These four assessments are identical and comprise another 9 pages of the 495-page record. *See id.* They rely entirely on the reports prepared by Dr. Murphy and Dr. DeBernardi, in addition to the record of Ms. Montoya's grades from the charter high school she attended. *See* AR 71–77, 91–97, 111–17, 132–39 (listing all records reviewed for both the physical and mental residual functional capacity assessments). None of these doctors' reports provide sufficient information for the ALJ to determine whether Ms. Montoya's impairments meet or equal Listing 12.05C. Because the evidence in the record established the reasonable possibility of the existence of an intellectual disability, the ALJ was required to further develop the record by ordering a consultative exam that included an IQ test.

VII. **Conclusion**

The ALJ erred by failing to either incorporate, or explain why he rejected, limitations assessed by the two consulting psychologists who examined Ms. Montoya. In addition, the ALJ erred by failing to adequately develop the record to provide sufficient information for a

17

determination as to whether Ms. Montoya's impairments met or equaled Listing 12.05, relating to intellectual disabilities.  I remand so that the ALJ can develop the record sufficiently to determine whether Ms. Montoya's impairments meet or equal Listing 12.05, and if not, to either incorporate, or explain why he rejects, any limitations found by any medical source, including any consultative examining psychologists.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 18) is GRANTED.

**IT IS FURTHER ORDERED** that the Commissioner's final decision is REVERSED, and this case is REMANDED for further proceedings in accordance with this opinion.

_____
Laura Fashing
United States Magistrate Judge
Presiding by Consent